AUSA: Kathryn Wheelock

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 25 MAG 1575

UNITED STATES OF AMERICA

v.

DAVID MORRIS,

Defendant.

**COMPLAINT**

Violation of 18 U.S.C. §§ 922(a)(1)(A),
933(a)(1), 924(c)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

JAMES G. CHUNG, being duly sworn, deposes and says that he is a Special Agent with
the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and charges as follows:

## COUNT ONE
### (Unlicensed Dealing of Firearms)

1.      Between at least in or about March 28, 2025 through in or about May 9, 2025, in
the Southern District of New York and elsewhere, DAVID MORRIS, the defendant, not being a
licensed importer, licensed manufacturer, or licensed dealer of firearms within the meaning of
Chapter 44, Title 18, United States Code, willfully and knowingly engaged in the business of
importing, manufacturing, and dealing in firearms, and in the course of such business shipped,
transported, and received a firearm in interstate and foreign commerce, to wit, MORRIS dealt
approximately forty-seven firearms without a license in New York, New York.

(Title 18, United States Code, Section 922(a)(1)(A).)

## COUNT TWO
### (Trafficking in Firearms)

2.      Between at least in or about March 28, 2025 through in or about May 9, 2025, in
the Southern District of New York and elsewhere, DAVID MORRIS, the defendant, shipped,
transported, transferred, caused to be transported, and otherwise disposed of a firearm to another
person in and otherwise affecting interstate commerce, and did so knowing and having reasonable
cause to believe that the use, carrying, and possession of a firearm by the recipient would constitute
a felony as defined in Title 18, United States Code, Section 932(a), to wit, MORRIS sold numerous
firearms to a purchaser in New York, New York with reasonable cause to believe that the buyer
was trafficking the guns internationally.

(Title 18, United States Code, Section 933(a)(1).)

## COUNT THREE
### (Firearm Use, Carrying, and Possession)

3.      On or about April 18 and May 9, 2025, in the Southern District of New York and elsewhere, DAVID MORRIS, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the knowing and intentional distribution and possession with intent to distribute a controlled substance, to wit, cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C), knowingly used and carried a firearm, and in furtherance of such crime, possessed a firearm.

(Title 18, United States Code, Section 924(c)(1)(A)(i).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I have been an ATF Special Agent for approximately five years. I am currently assigned to the New York Group II Joint Firearms Task Force. I have been personally involved in the investigation of this matter, and this affidavit is based upon my personal participation in the investigation, my conversations with other law enforcement witnesses, and my review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      From my communications with other members of law enforcement, including from the New York City Police Department ("NYPD"), as well as my review of law enforcement records, cellphone evidence, recorded calls, audio and video recordings of controlled firearms buys, photographs, firearms and ammunition obtained during the controlled firearms buys, and other evidence collected as part of this investigation, I have learned the following, among other things:

*The March 28 Buy*

a.      On or about March 28, 2025 at approximately 2:49 p.m., MORRIS, using a cellphone ending in -1884 (the "1884 Cellphone"), called an undercover law enforcement officer ("UC-1") to discuss the meet-up location for a firearm transaction (the "March 28 Buy"). UC-1 confirmed that the voice of the individual on the other end of the call matched the voice of the person whom UC-1 knew as "Ave." During a prior call between MORRIS and UC-1, MORRIS had offered to sell UC-1 fifteen firearms and they had agreed to meet for the transaction on March 28.

b.      Later, at approximately 3:15 p.m., after activating his/her audio and visual recording equipment, UC-1 drove to a parking lot in the vicinity of Catherine Slip and South Street in lower Manhattan, where UC-1 and MORRIS had agreed to meet. A few minutes later, MORRIS drove up in a black Kia sedan with a particular Georgia license plate (the "Black Kia") and parked nearby. MORRIS then got into UC-1's car wearing a backpack. MORRIS gave the backpack,

containing fifteen firearms[1] and 72 rounds of ammunition, to UC-1. MORRIS told UC-1 that the guns were "wiped down," which I understand, based on my training and experience, to mean that the guns were wiped clean of fingerprints. In exchange for the firearms, UC-1 gave MORRIS $10,000.

        c.     UC-1 then told MORRIS that UC-1's "uncle"—who was, in reality, a second undercover law enforcement officer ("UC-2" and together with UC-1, the "UCs")—would be arriving soon with the rest of the money. Approximately five minutes after MORRIS had arrived at the meeting spot, UC-2 arrived at the meeting location and entered the rear passenger seat of UC-1's car. UC-2 then gave MORRIS $5,000, which was the balance owed to MORRIS for the firearms.

        d.     The UCs and MORRIS engaged in conversation during which MORRIS said, among other things, that he had armor-piercing ammunition in his car. MORRIS also showed UC-2 a photograph of a firearm on his cellphone, and MORRIS told the UCs that he had shot the firearm depicted in the photograph. The UCs and MORRIS also discussed that if UC-1 were not available in the future, UC-2 would buy firearms from MORRIS. MORRIS told the UCs that he sells firearms with a team in Atlanta, and that he has been selling firearms for ten years. MORRIS provided UC-2 with his contact information to coordinate additional firearms transactions.

        e.     At approximately 3:30 p.m., MORRIS exited UC-1's car and returned to the Black Kia. The UCs departed the meet-up spot.

*The April 18 Buy*

        f.     On or about April 8, 2025, UC-1 communicated with MORRIS via a Telegram account that MORRIS had previously provided to UC-1 (the "Telegram Account"). MORRIS offered UC-1 various types of firearms and discussed when MORRIS would come to New York to sell the guns. UC-1 indicated that he/she would be selling the guns to another person (referring to UC-2). MORRIS told UC-1 he would be coming for the gun transaction in the next week.

        g.     On or about April 16, 2025, UC-1 communicated with MORRIS via the Telegram Account. On the phone call, MORRIS informed UC-1 that MORRIS had "just gotten on the road."

        h.     On or about April 18, 2025, at approximately 11:45 a.m., after activating his/her audio and video recording equipment, UC-2 drove to the same parking lot where the March 28 Buy took place (the "April 18 Buy"). MORRIS was already at the meeting location, in the Black Kia, when UC-2 arrived. MORRIS approached UC-2's car, opened the front passenger door, grabbed an empty bag from UC-2, and went back to the Black Kia. After a few minutes, MORRIS returned to UC-2's car, got inside with the duffel bag—which was now filled with fifteen

---

[1] The firearms are a Beretta model APX, a Canik 55 model TP9SF Elite, a Glock Model 19, a Taurus Model G3, a Smith & Wesson Model M&P 380 Shield EZ, a Smith & Wesson Model M&P 9 Shield PC, two Taurus Model G2Cs, a Taurus International Model PT738 TCP, a Ruger Model EC9S, a Ruger Model LCP Max, a Ruger Model LCP, a Ruger Model LPR, a SCCY Industries Model CPX2, and a Sig Sauer Model P365 SAS.

firearms[2] and 125 rounds of assorted ammunition—and handed it to UC-2. UC-2 then examined the firearms and gave $15,600 to MORRIS for the firearms.

        i.     During the April 18 Buy, MORRIS told UC-2, among other things, that MORRIS had access to "buttons" for the Glock firearms—which I know, based on my training and experience, is a term used to refer to machine gun conversion devices, or "switches," that convert a standard semi-automatic pistol into a machinegun able to fire multiple rounds with one pull of the trigger.[3]

        j.     MORRIS also told UC-2 that he would provide UC-2 a "sample" of "pure coke," and asked UC-2 if he/she could help "move" it. MORRIS then exited UC-2's car and returned a few minutes later with a white powdery substance wrapped in aluminum foil, which he handed to UC-2. The substance lab-tested positive for cocaine and weighed less than one gram.

        k.     At approximately 11:58 a.m., MORRIS exited UC-2's car and returned to the Black Kia. UC-2 departed the meet-up spot.

      6.     Based on my review of information from law enforcement databases, law enforcement records, and audio and video recordings of the March 28 Buy and the April 18 Buy, I am aware of the following:

        a.     The Black Kia—which was driven to both the March 28 Buy and the April 18 Buy—is registered to DAVID MORRIS, the defendant, in Georgia, where I believe MORRIS lives based on his statement to the UCs that he sells guns with a team in Atlanta.

        b.     The individual depicted in law enforcement surveillance video selling firearms during the March 28 Buy and the April 18 Buy is consistent with a known photograph of MORRIS.

        c.     On or about April 18, 2025, UC-2 was provided a photo array containing six photographs, the last of which was a photograph of MORRIS from MORRIS' Georgia driver's license. After being provided viewing instructions by law enforcement,[4] UC-2 reviewed the photo array and indicated that photograph six was a person UC-2 recognized as "JD Ave," the person at the gun buy earlier that day.[5]

---

[2] The firearms are a CZ Model CZ P09, a CZ Model CZ75 B, a Ruger Model Security9, a Ruger Model Ruger57, a Glock Model 19 Gen5, a Taurus Model G3C, two Taurus Model G2Cs, a Taurus Model PT809C, a Taurus Model 856 Ultralite, a Taurus Model Judge, Smith & Wesson Model M&P 9 Shield EZ, a Smith & Wesson Model M&P 9 Shield Plus, a Sig Saur Model P365, and an AMT California Model Backup.

[3] An ATF agent firing a pistol outfitted with a "switch" can be viewed here: https://youtu.be/Tmyk9qm3wkQ.

[4] UC-2 was not provided any information about the individuals in the photographs before, during, or after the identification procedure.

[5] I know, based on my training, experience, and understanding of NYPD practices, that this is the moniker that law enforcement used to refer to MORRIS during the investigation, with "JD" meaning "John Doe," and "Ave" being the nickname that MORRIS provided to UC-1.

d.      Accordingly, I believe that the individual who sold firearms to the UCs on or about March 28, 2025 and April 18, 2025 is MORRIS.

*The May 9 Buy*

7.      Based on my communications with other law enforcement officers, my review of recorded calls and location data for the 1884 Cellphone, my observations during a May 9 controlled buy and subsequent arrest of DAVID MORRIS, the defendant, and my involvement in this investigation, I am aware of the following:

a.      Between on or about May 1 and May 8, 2025, UC-2 and MORRIS communicated via the Telegram Account regarding, in sum and substance, MORRIS selling guns to UC-2 and bringing them to UC-2 in New York City.

b.      In particular, on or about May 8, 2025, UC-2 and MORRIS communicated via the Telegram Account. During a phone call at approximately 9:30 a.m., MORRIS said that he would be departing for New York in the evening and that, in addition to firearms, he was bringing "pure white," which I believe to be a reference to cocaine. Then, at approximately 8:15 p.m., MORRIS and UC-2 spoke via the Telegram Account again. On this call, MORRIS said that he had 18 firearms, was in route to bring them to UC-2, and planned to arrive in New York City at approximately 10:00 a.m. the following morning, May 9, 2025 (the "May 9 Buy"). UC-2 told MORRIS that he wanted to know the number of firearms because he was bringing "that shit to Trinidad[.]"

c.      On or about May 9, 2025, at approximately 8:12 a.m., MORRIS drove the Black Kia to the meeting spot, which was the same location as the March 28 Buy and the April 18 Buy. A few minutes later, MORRIS entered UC-2's car and gave UC-2 seventeen firearms[6] and a white, powder substance in plastic baggies[7] in exchange for $21,500. After this May 9 Buy, MORRIS was arrested.

d.      Cellphone location data confirms that MORRIS transported from Georgia to New York the firearms sold in the May 9 Buy. From my review of location data for the 1884 Cellphone, which was obtained pursuant to a judicially authorized warrant, I understand that the 1884 Cellphone traveled from Georgia to New York beginning at approximately 7:30 p.m. on May 8, 2025. According to this data, the 1884 Cellphone did not stop overnight. In addition, based on my communications with other law enforcement officers, MORRIS told UC-2 during the May 9 Buy that he came straight from Georgia, only stopping for gas.

8.      Based on my review of an ATF database for licensed firearms importers, manufacturers, and dealers, and my involvement in this investigation, I am aware that DAVID

---

[6] Based on initial analyses of the firearms, it appears that none are equipped with machinegun conversion devices. The firearms are a Taurus Model G3C 9mm, a Taurus Model G2C, a Glock 19 Gen5, a Glock PMF, a Smith & Wesson SD40VE, a Smith & Wesson M&P 45 Shield, Smith & Wesson M&P 40 Shield, two Smith & Wesson M&P Shields, a Smith & Wesson SD40, a Smith & Wesson SD40VE, a Berretta 92FS, a Ruger Max9, a Ruger 57, a Sig Sauer P365 9mm, an FEG PA-63, and Zigana PX9.

[7] Based on my review of prior conversations between MORRIS and UC-2, the fact that MORRIS had provided UC-2 cocaine "sample" during a prior controlled buy, and my training and experience, I believe that the substance contains cocaine.

MORRIS, the defendant, does not have a federal firearms license and accordingly, is not a licensed firearms importer, manufacturer, or dealer. I am also aware, based on my participation in the Mirandized post-arrest interview of MORRIS, that MORRIS stated that he does not have a license to sell guns.

9.    A photograph of the forty-seven firearms that MORRIS sold to the UCs on or about March 28, April 18, and May 9, 2025, and the white, powder substance that MORRIS sold to UC-2 on or about May 9, 2025, are depicted below:



WHEREFORE, I respectfully request that a warrant be issued for the arrest of DAVID MORRIS, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

JAMES G. CHUNG
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to before me on this
9th day of May, 2025

THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

7